Thank you, Your Honor. Gary Preble from Olympia, representing the appellant, now Cece Tillett, who is the daughter of both George Tillett Sr. and Grace Tillett, who always went by Mike. The issue here is this is a fact-based case. This is a summary judgment, and it's a summary judgment that should not have been granted. There are material issues of fact that were overlooked by the district court. Well, overlooked is probably not a fair word, but the district court had a different opinion than I do about those facts. That happens. And he made decisions that should not have been made that should have been left to the jury. In particular, one of those is the reasonableness of the actions of the police. And a lot of it comes down to several important points. One is that here we have a drug raid on the home of George Tillett Jr., known as Tom, and he's not hereafter referred to as George for convenience. He also had a garage, as it were, a car garage for fixing cars there. And his father had a parts business that was there through what is called the man door, as the police termed it. And the police, in doing the raid on the home, knew there were going to be people in the garage because they knew of... He referred to a raid. Weren't they executing a search warrant? You know, I apologize. From our perspective, it was the same. I think that there are some overlap in use of that term, but yes, this was an execution of a search warrant, but they used raid procedures in terms of the stick. That is, the stick being the line of officers that flowed into the building. They knew, but I'm sorry, I can't quite pick out in my mind a specific example of that overlap, but I believe there is. They knew at the briefing done by Mr. or Officer Polonsky that George was there and that George ran a parts business. In fact, George had had a long-time parts business. I don't know if that shows up in this record, but he was downsizing and now working at his son's. And as Officer Polonsky says, he knew of George's reputation and knew that it was not a bad reputation, as opposed to Tom's reputation, which was not good. So, they knew ahead of time. They came up to the house and right there through the man door is George, sitting there. May saw him. Inkelbarger saw him. Inkelbarger was looking at him for about, oh, I think up to 10, 15 seconds, as Inkelbarger says. And Whatley, who was behind, presumably saw him. Whatley acknowledged in the materials we presented that he saw somebody going into the garage and called him out. That may have been Tom, but Whatley wasn't quite sure where he was when that happened. So, here they were, before they're going in to execute the search warrant, and they're thinking in terms of, well, this is a dangerous situation, but it's not a high-risk situation. The picture that sticks in my mind is something that didn't happen, and that is George coming out of the man door and putting a bullet through Whatley's back. It didn't happen, but it could have. In other words, they did not, and it wouldn't have, because that wasn't George, but the fact is, if these officers were concerned about their safety, then why are they going to let the man in the man door, who was George, stay there while they are executing the warrant? Are they concerned about their safety? Not really. They're expecting, perhaps, patrol to do it. Patrol was supposed to go in and secure the garage, although there's some conflict here, because Pulaski, in his testimony, says that he didn't expect the patrol to go into the garage. But, nevertheless, the plan says that Pulaski was going to go into the garage. So, here we have, was it reasonable for the officers to leave George there, sitting in the man door, if they were concerned about his safety? Then, they go through the house, they go up the stairs, and come back down the stairs, which ends up about where the back of George's office was. That's when George came out and Whatley saw him. Whatley used excessive force there, because he was thinking like a SWAT team member. Whatley was not properly trained by the city. It's obvious. They knew he had come from, I think it was Everett, where he had been a SWAT member. But, Plum had to call him out in the post-execution briefing and say, you know, you could have done it better. As Plum points out, Whatley tried to explain, or tries to excuse his actions, by that's how they did it in the SWAT. Well, at the time, the excessive force, am I correct that your client was standing, opened a door, and was standing there with a heavy coat, and was asked to move or something? He was, apparently, my late client. Yes, according to Whatley's testimony, he came out of the door at the back of the office, and they had seen through the man door at the front of the office. So, he came out of the back of the office. He's an old man, he's 82, and there's no evidence that he really knew what was going on in the house. Well, did they have to question him about that? I mean, we have to look at this from the standpoint of a reasonable police officer. That's exactly right. But, Whatley knew already from the briefing that this was likely George Sr., that this was an old man, he had a parts operation there. Just one look, all, in fact, Whatley's testimony indicates there were parts around, and the other officers too, but just one look in the office, he knew it was a parts counter, parts store. Did they know that he's not dangerous? Inkelbarger did. Well, did they know he was not dangerous when three of them see him through the man door? That's why I said the picture that's in my mind is what didn't and wouldn't have happened, and that is that George put in a bullet in the back of Whatley, who was the last in the stick. What I'm saying is they presumed he was not dangerous because they let him go at a time when he was there and could have taken, if they were really concerned about themselves, they should have been concerned about that guy who sees these six police officers going along with a shield and a rifle. Did that answer your question, Your Honor? Is it reasonable back here? Well, I think we have to look at all the circumstances. Is it reasonable after Whatley, the SWAT team thinker, came back around and saw George come out of the door? No. Is it, and that's, I think, Your Honor, that really answers the question. That's what a jury, that's what 12 people need to decide. Okay. And that's really what that comes down to. Do you want to argue, I think we understand that. Do you want to argue any of your other points? I think the briefing takes care of it. We've got the fellow officer doctrine, which I think goes in here. But I will leave the, I will let counsel make his argument and then respond. I have about five-fifty minutes. Thank you. Correct. Thank you. Good morning. May it please the Court. Mark Koontz, representing the City of Bremerton and its police officers. This is a somewhat unique case in that in excessive force cases, typically you have one version from the plaintiff and then a very different version from the defendants. In this case, we have one version that's in the record, and that's the version that Detectives Watley and Inkelbarger provide through their police reports and their testimony at deposition. Those are the facts of the case. They present all the material facts. The material facts are not in dispute. I do want to correct some of the facts based on the record from what counsel stated. Detective Watley, first of all, did not see anyone in this manned door. And that's at supplemental, or SER 60. His job, and his job was not in the back of the stick, as they call it, he was the number two person. His sole job, well not his sole job, his primary job was to cover the number one person. The number one person is the person who's knocking on the door and the first person to make entry. And obviously someone who is the first person to be likely to encounter any uncooperative occupant of the residence. So his sole job is to concentrate on the front door and to concentrate on the first person in the stick. He wasn't paying attention to the manned door. And again, that's in the record at supplemental excerpt of record 60. It's very clear that he did not see anyone in the manned door. That was not his focus. He was looking at the front door. So I wanted to make that clear. I think we should start with the search warrant. Because that's what gives the officers the authority to detain the occupants. The Supreme Court in Mueller versus Mina and Michigan versus Summers are clear that the authority to detain an occupant while serving a search warrant is categorical. And they come to that conclusion for a couple of reasons. First of all, you've already vetted this through a judge who's made a determination of probable cause to allow you to search the house in the first place. And that's what the Bremerton police officers did. They went to Kitsap County Superior Court and they received a search warrant to search this residence as part of their narcotics investigation. Did the search warrant indicate that they suspected any particular person? The son? Mike or George or whatever? There was a target of the investigation. It was actually not George. It was a person named Mick Shepard who was living there. But again, as Mueller and Summers point out, all of the occupants of the residence may be detained. And again, that goes to the second reason that the Supreme Court has given for this categorical authority. And that's because you don't know which occupants are going to be uncooperative. Did the Supreme Court premise the right to detain based on the officers' fear that they might be assaulted? You know, that's how it came to that result. In MENA, it involved gang activity that the officers were investigating. In Summers, it was a narcotics investigation like what we have here. And Summers is very clear to point out that serving a search warrant in narcotics investigations is inherently dangerous. Now, we also have the testimony of Sergeant Randy Plum from the Bremerton Police Department who also says this is inherently dangerous work to serve a search warrant on a residence where you have probable cause to believe that there is a narcotics delivery operation going on. Obviously, possibility of guns. They're protecting their merchandise and money. And so certainly in this particular situation, as in Summers, the officers had this categorical authority. They didn't have to weigh, you know, the evidence. They didn't have to think about, well, is this person really going to be dangerous? They had the authority to detain everybody in that residence. And that brings us to the force used, which is really the crux of this case. And I think that plaintiff's other claims rise and fall with the determination of the reasonableness of Detective Whatley's use of force. So Detective Whatley, first of all, he enters the house. He doesn't know Tillett. There are other people in the stick that have had previous encounters with Mr. Tillett. As counsel said, he had been a business owner in the area for a while. I believe Detective May knew him. I believe Detective Polonsky and Inka Barger may have known of him or would recognize him. Whatley did not. Again, I don't know that that is necessarily relevant because of Mr. Tillett's actions, but it does show that when Whatley first saw somebody come out of the door from this parts shop, he didn't know who he was. All he knew that it was a white male and he was wearing a big puffy jacket. And so what did Detective Whatley do? He did what he was trained to do, what's appropriate under the Supreme Court in Mueller and Summers. He took his rifle and he pointed it at Mr. Tillett and told him to stop and get on the ground. Mr. Tillett said no and tried to go back into the parts shop and close the door. Well, Whatley had two choices there. He could either let Tillett go back into the parts store where he could potentially get a weapon, he could potentially destroy evidence, he could potentially summon aid from someone to help him to resist being detained, or While they could actively prevent the door from being closed and take Mr. Tillett into custody, as he has the authority to do under our Supreme Court decisions. And he chose the reasonable and safe path. And he prevented the door from being closed and went into the little parts shop there. Now at that point, again, he lowered his rifle and he gave Mr. Tillett the opportunity to cooperate. And he said again, police, go to the ground. Tillett is backing up. His hands are still concerning Detective Whatley because they're underneath this jacket. And he falls, as Whatley comes toward him, he falls back into a sitting position. Whatley still has not touched, has made any physical contact with Tillett at this point. So Tillett falls to his seat in a sitting position. And at that point is where Detective Whatley makes the first physical contact with Mr. Tillett. And he grabs him by the jacket, again, while he's saying police, go to the ground. Tillett again says no and is resisting. Tillett grabs him and then takes him to the ground and handcuffs him. And, of course, before he can handcuff him, he has to grab his arms. Tillett has his arms underneath him. And so there is some force that's used to grab his arm. The force was minimal in this case, very minimal. And, of course, that's the first factor that we look at is the quantum of force when determining the reasonableness. And there was no striking. There was no hitting. Detective Whatley did not use a baton or asp or taser, anything like that. It was a grabbing of the jacket. And then there was a handcuffing. Then Mr. Tillett was taken out of the house. And after five minutes, the handcuffs were removed. And another officer retrieved his cup of tea for him to sip on while he's waiting for the house to be cleared. Now, the backdrop of the minimal use of force, the quantum of force, that's what you use as a reference when you're applying the other gram factors. And the severity, of course, one of the factors is the severity of the crime. This is a narcotics investigation. Is there any question here as to whether the district court properly applied the gram factors? I do not believe so. I believe they were properly applied. And the severity of crime, this is a felony narcotics investigation, whether the suspect posed an immediate threat. We have the testimony from Detective Whatley that he did not know who this was. He was concerned that this person was wearing a jacket that could have concealed a weapon. He was concerned when Tillett went into the parts store and attempted to close the door, was he going to gather a weapon? Was he going to summon aid? And this is a fluid scene. And, again, we don't look at it from the hindsight of 2020, finding out later. I think we understand your point there. Thank you. Do you wish to address any of the other issues that have been raised? You know, I think I'll rely on my briefing with respect to the other issues, because I think once you resolve that issue, the other causes of action go away. If there are no further questions. Are there any further questions? Thank you. Thank you. I appreciate counsel's correction, and I apologize to the court. That wasn't Whatley's back that didn't have a bullet in it, and I do apologize for that. I was thinking about Enkelbarger talking about speaking to the people behind him when he was there, and it was 12 seconds, I found the citation. It was up to 10 or 12 seconds. And I asked him in deposition, did you say it forward, and he said, I said it to be heard. So Enkelbarger intended that it be known that he had seen George through the man door, and I think it was May who also saw him. So I do apologize for that. But that doesn't excuse Whatley, because at the briefing ahead of time, which is, excuse me, I would point out to page 67 in the plan, it said there will likely be people inside the garage. There's a large attacks garage. So that was to be expected. In addition, in page 78, May said, we also had information that George Tillett Sr. was operating a vehicle repair shop out of the garage at the residence. And I believe the confidential information told Detective Polonsky and I had some information from the building inspectors. Mr. Preble, at exactly what point do you think the force was excessive, exactly what was done? The force was excessive in the manner that Officer Whatley did a takedown on an 82-year-old man under circumstances, in the fuller circumstances, and all the officers, that Whatley should have known. He was an 80-year-old man? 82, I'm sorry, I misspoke. That Whatley, you're right, George. No, I'm just saying, is it your position that he should have known that he was an 80-year-old man who posed no danger? Or what? Yeah, it was that he was an older man, but that he was expected to be there. And that was told ahead of time. I was just looking for page 94 here. When Polonsky talks about his narrative report, he said the PO in this case, the confidential informant, I think it was, in this case, also informed me the garage attached to the residence was being used as a business selling auto parts. I advised the SOG units to clear the house for occupants. Counsel, was there any evidence contradicting that when the senior, Mr. Tillett, was asked to go to the ground or to get down by the police, as has been relayed, that he declined to do so, tried to go back through a room? Because if that's true, why can't the, why isn't it, if that's true that they ask him to get down and he won't and he tries to go back to another room, why is it excessive force to stop him from doing that? Because at that point, and Plum saw this when he talked to, we have to put a number of things together. It doesn't all line up all in a row. But the key is what Plum had to say to Watley. And on 69, he said, there was, you could have done it better. And he tried to justify his actions. And I explained to him, this was not a SWAT operation, but a judge search warrant execution. So the unreasonableness was the manner in which Watley came to it Do you accept, do you agree with the facts that Mr. Tillett refused to, you know, cease his movement and get on the ground? We have no basis. He tried to exit. Excuse me, Your Honor. Tried to exit to another room. Tried to just go back into the room he'd been in that they'd already had an open view to. Yes, I don't. George skipped the jurisdiction, if you will, and so we can't get his testimony. Right. So if that's the undisputed record, and, you know, we know that even an 82-year-old man, if he's a bad character, can pull a trigger or deploy a weapon. Why is it unreasonable for police to take him down? I'm having trouble with that. Even if another officer criticized him, said you could have done it better, well, maybe he could have done it better, but that doesn't mean it's excessive per se. Well, he knew that that's not where they were executing the search warrant. They were doing it in the house. He knew that there was a business there in the garage that was different from the house. It's an attached garage, but it's still different. He could have dealt with it a better way. He could have recognized that this was a man who was just, what is going on here? It could have been avoided. Yes. But does that make the conduct unreasonable? I think that... That's really the question, isn't it? It is. It is, and I think that that's up to the jury to decide. All right. Thank you. Thank you very much. The matter just argued is submitted for decision. Before hearing the last two cases, the Court will take a 15-minute recess.
judges: Schroeder, Alarcon, Gould